**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

KIRSTEN SPARGO,

        Plaintiff,

vs.

STATE FARM FIRE AND CASUALTY COMPANY,

        Defendant.

Case No. 2:16-cv-03036-APG-GWF

**ORDER**

This matter is before the Court on Plaintiff's Motion to Compel (ECF No. 15), filed on May 10, 2017. Defendant filed its Response (ECF No. 25) on May 24, 2017. Plaintiff filed a Supplement to the Motion to Compel (ECF No. 24) on May 24, 2017, and filed her Reply (ECF No. 34) on May 31, 2017. Also before the Court is Defendant's Motion for Protective Order (ECF No. 28), filed on May 25, 2017. Plaintiff filed her Response (ECF No. 33) on May 31, 2017. The Court conducted a hearing on these motions on June 5, 2017.

**BACKGROUND**

Plaintiff Kirsten Spargo alleges that she suffered bodily injuries in a May 26, 2009 accident when another motorist ran a stop sign and collided with her vehicle. She made a claim against the other driver's liability insurance policy and subsequently settled for the $15,000 limits of that policy. On May 13, 2011, Ms. Spargo made a claim to State Farm for underinsured motorist benefits. On February 27, 2012, she filed a lawsuit against State Farm for breach of the underinsured motorist coverage contract. On April 4, 2012, State Farm sent a letter to Plaintiff's attorney stating that the medical records showed that Ms. Spargo had seen a doctor for four (4) to five (5) years for neck symptoms and headaches. State Farm stated that to move forward it would need all medical records from Dr. Mayor and Dr. Simoncelli.

On July 5, 2012, Plaintiff provided State Farm with signed authorizations for (1) medical records, (2) employment records, (3) insurance claims records, (4) worker's compensation records, and (5) tax returns. On July 9, 2013, State Farm requested that Ms. Spargo undergo a medical examination with Dr. Schiffini, a doctor hired by State Farm. On October 30, 2014, Planitiff's attorneys advised State Farm that she was still treating with Dr. Hogan and Dr. Burkhead. Plaintiff alleges that during the lawsuit State Farm unreasonably undervalued her claim and forced her to engage in prolonged litigation to recover the policy limits. State Farm paid the policy limit of $250,000.00 on August 26, 2015. Plaintiff alleges that "State Farm's attorney in the breach of contract action recommended to State Farm that it pay the policy limits two years earlier in the litigation and State Farm chose instead to delay the litigation and force Kirsten into prolonged litigation." *Amended Complaint* (ECF No. 1), ¶¶ 11–19.

Planitiff's counsel Sean Claggett submitted a declaration in which he states that Defendant's counsel in the breach of contract action, Gina Winspear, "told Samuel Harding—an attorney at my firm—and me that she had advised State Farm to pay the policy limits years earlier than when State Farm finally paid the policy limits." *Motion to Compel* (ECF No. 15), pg. 3, ¶ 12. In response, State Farm filed a declaration by Ms. Winspear in which she states that "[d]uring my handling of the defense of the state court case, I never told Plaintiff's counsel, Sean A. Claggett, Esq. or Samuel A. Harding, Esq., that I recommended that Defendant pay Plaintiff's $250,000 UIM policy limits because her UIM claim had a value of $250,000." *Response* (ECF No. 25), *Exhibit B*, ¶ 8. In reply, Mr. Claggett submitted another declaration stating that "I distinctly remember Mr. Harding and I talking to Ms. Winspear about the breach of contract action at the Clark County Regional Justice Center following a hearing. During that conversation, Ms. Winspear seemed frustrated at the case and told us that she had been telling State Farm to settle the case for policy limits for years. I recall this conversation because I believed at that time that it likely meant that State Farm acted in bad faith." *Reply* (ECF No. 34), *Exhibit 7*, ¶¶ 4-5.

State Farm has produced portions of its claims file relating to Plaintiff's UIM claim. It has, however, withheld letter/reports provided to it by Ms. Winspear in the underlying breach of contract

action.[1]  State Farm also withheld claim log entries regarding communications with its counsel in the underlying action.  State Farm asserts that these letter/reports and claim log entries are protected from disclosure pursuant to the attorney-client privilege and the work product doctrine.  Plaintiff argues that she is entitled to obtain these letter/reports and related claim log entries because they are directly relevant to her claim that State Farm unreasonably undervalued and delayed the payment of her claim.  Plaintiff argues that neither the attorney-client privilege or the work product doctrine protects the letter/reports or log entries from disclosure in this action.

## **DISCUSSION**

An insurer fails to act in good faith when it refuses without proper cause to compensate the insured for a loss covered by the policy.  Such conduct gives rise to a breach of the covenant of good faith and fair dealing and constitutes "bad faith." *Pemberton v. Farmers Ins. Exch.*, 109 Nev. 789, 858 P.2d 380, 382 (Nev. 1993).  An insurance company may be found liable in tort for the "bad faith" refusal or failure to pay uninsured or underinsured motorist coverage benefits. *Id.* at 383.  *See also Allstate Prop. & Cas. Co. v. Mirkia*, 2013 WL 944778, at *7 (D.Nev. March 7, 2013); *Chacon v. State Farm Mut. Auto. Ins. Co.*, 2017 WL 1179945, at *2 (D.Nev. March 29, 2017).  "Bad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct." *Guaranty National Ins. Co. v. Potter*, 112 Nev. 199, 912 P.2d 267, 272 (Nev. 1996).  An insurer may be liable for punitive damages if it is shown by clear and convincing evidence that the insurer has been guilty of oppression, fraud or malice. *Id.* at 273.  *See also Hackler v. State Farm Mut. Auto. Ins. Co.*, 210 F.Supp.3d 1250, 1258 (D.Nev. 2016).

The duty of good faith continues during any litigation that is brought to recover policy benefits. *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 517-18 (Ky. 2006) (citing *White v. Western Title Ins. Co.*, 710 P.2d 309, 316-17 (Cal. 1985), *Haddick v. Valor Ins.*, 735 N.E.2d 132, 133 (Ill.App. 2000), *Harris v. Fontenot*, 606 So.2d 72, 74 (La.Ct.App. 1992), *Palmer v. Farmers Ins. Exchange*, 861 P.2d 895, 913

---

[1] State Farm voluntarily submitted these reports to the Court for *in camera* review should the Court conclude that such review is necessary.  The letter/reports are dated May 8, 2012, June 26, 2012, August 24, 2012, November 13, 2012, February 4, 2013, March 26, 2013 (two letters), July 25, 2013, December 3, 2013, February 20, 2014, December 11, 2014, January 9, 2014 (this is probably misdated as to year), January 27, 2015, January 23, 2015, April 30, 2015, July 14, 2015, August 3, 2015, August 6, 2015, and August 25, 2015.

(Mont. 1993), *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.Ct. 1999) and *Barefield v. DPIC Companies*, 600 S.E.2d 256, 267 (W.Va. 2004)). *See also Sinclair v. Zurich American Ins. Co.*, 129 F.Supp.3d 1252, 1257 (D.N.M. 2015). Here, Plaintiff alleges that State Farm acted in bad faith during the course of the underlying breach of contract action.

1. **<u>Work Product Doctrine</u>**

The work production doctrine protects from discovery by the opposing party materials prepared in anticipation of litigation. Fed.R.Civ.Pro. 26(b)(3). Application of the doctrine is governed by federal law. *Kandel v. Brother Intern. Corp.*, 683 F.Supp.2d 1076, 1083 (C.D.Cal. 2009); *Moe v. System Transport, Inc.*, 270 F.R.D. 613, 622 (D.Mont. 2010); and *Abueg v. State Farm Mu. Auto. Ins. Co.*, 2014 WL 550311, at *3 (D.Nev. Oct. 30, 2014). The party claiming work product immunity has the burden of proving the applicability of the doctrine. *Kandel*, 683 F.Supp.2d at 1083-84 (citing *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 192 (C.D. Cal. 2006)). Rule 26(b)(3) distinguishes between ordinary work product and opinion work product. Ordinary work product is discoverable if the requesting party shows a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Moe*, 270 F.R.D. at 626-27 (quoting Rule 26(b)(3)(A)(ii)). "In contrast, the Court is obligated to 'protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representatives concerning the litigation. Thus, opinion work product is afforded greatest protection, and a party seeking such materials must show that the 'mental impressions are directly at issue in a case and the need for the materials is compelling.'" *Id.* at 627 (quoting *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 282 (D.Mont. 1998)). *See also Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 634 (D.Nev. 2013).

In *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573 (9th Cir. 1992), the court stated that in a bad faith insurance claim settlement case, the "strategy, mental impressions, and opinions of [the insurer's] agents concerning the handling of the claim are directly at issue." *Id.* at 577 (citing *Reavis v. Metropolitan Property & Liability Ins. Co.*, 117 F.R.D. 160, 164 (S.D.Cal. 1987)). "Unless the information is available elsewhere, a plaintiff may be able to establish a compelling need for evidence in the insurer's claim file regarding the insurer's opinion of the viability and value of the claim. We review the question on a case-by-case basis." The court further noted that "in bad faith settlement cases,

insurers may call their adjusters to testify to their opinions as to the lack of viability of the underlying claim. When an insurer chooses to remain moot on the subject, the plaintiff is not foreclosed from developing the same evidence." *Id.* at 578.

The insured's right to discover the opinions and mental impressions of the insurer's claims adjusters does not mean, however, that she is entitled to obtain the confidential opinions, mental impressions or legal theories of the insurer's attorney. In *Siddall v. Allstate Ins. Co.*, 15 Fed.Appx. 522 (9th Cir. Aug. 1, 2001) (unpublished memorandum), the plaintiff argued that he had "a substantial need" for the mental impressions, conclusions, and opinions of the insurer's attorney. The court stated that "[i]n analyzing this contention, it is important to discern the difference between the attorney-client privilege and the work product doctrine. Even if we agreed that Siddall had a substantial need for the requested documents, a substantial need does not, as a matter of law, provide a legal basis for piercing the attorney-client privilege. It can, however, provide a basis for obtaining material withheld under the work product doctrine." *Id.* at 522. Likewise, in *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 294 (D.Mont. 1998), the court stated that a compelling need to obtain the insurance adjuster's mental impressions and opinions does not, in and of itself, support production of the mental impressions and opinions of the insurer's attorney. In *Yurick ex rel. Yurick v. Liberty Mut. Ins. Co.*, 201 F.R.D. 465, 473 n. 13 (D.Ariz. 2001), the court relied on *Holmgren* and *Brown v. Superior Court*, 137 Ariz. 327, 670 P.2d 725, 735 (Ariz. 1983) in stating the mental impressions and opinions of the insurer's claims personnel were discoverable in a bad faith action, "but *not* the attorney-client communications" between the insurer and its counsel which were protected by the attorney-client privilege. Therefore, although the work product doctrine may not protect the attorney's mental impressions and opinions from being discovered in a bad faith action, they may still be protected under the attorney-client privilege.

2. **Attorney-Client Privilege**

In a federal action based on diversity of citizenship jurisdiction, state law governs attorney-client privilege claims. *Kandel*, 683 F.Supp.2d at 1081. (citing Fed.R.Evid. 501; *Star Editorial, Inc. v. United States District Court for Central District of California (Dangerfield)*, 7 F.3d 856, 859 (9th Cir. 1993); *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 284 (C.D.Cal. 1998)). Nevada Revised Statute (NRS) § 49.095 states that a client has a privilege to refuse to disclose and to prevent any other person from

disclosing confidential communications (1) between himself or his representative and his lawyer or his lawyer's representative; (2) between his lawyer and the lawyer's representative; (3) made for the purpose of facilitating the rendition of professional legal services to the client, by him or his lawyer to a lawyer representing another in a matter of common interest.

The attorney-client privilege is waived when the client voluntarily reveals an attorney-client communication to a person outside the scope of the attorney-client relationship. *Wardleigh v. Second Judicial Dist. Court*, 111 Nev. 345, 891 P.2d 1180, 1186 (1995); *Manley v. State*, 115 Nev. 114, 979 P.2d 703, 707 (1999). As a general rule, a party impliedly waives the attorney-client privilege when it expressly relies on the advice of counsel as a defense to a claim against it. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992); *Apex Eyewear, Inc. v. E'Lite Optik, Inc.*, 276 F.Supp.2d 1084, 1092-93 (D.Nev. 2003). In such circumstances, the opposing party is entitled to discover the attorney-client communications relating to the subject matter of the advice. *Id.* State Farm states that it is not relying on the advice of counsel as a defense to Plaintiff's bad faith claim. It therefore argues that it has not waived the attorney-client privilege regarding confidential communications with its counsel in the breach of contract action.

Even if the insurer does not expressly assert advice of counsel as a defense to bad faith liability, a majority of courts hold that the plaintiff may still be entitled to discover the mental impressions or opinions of the insurer's coverage attorney because they are directly relevant to the issue of bad faith. In *Bertelsen v. Allstate Ins. Co.*, 796 N.W.2d 685,702 (S.D. 2011), the South Dakota Supreme Court stated that an insurer need not expressly rely on the advice of counsel to waive the attorney-client privilege. The court noted that "'[m]ost sophisticated litigants will know better than to dig that hole for themselves.'" *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Lee*, 199 Ariz. 52, 64, 13 P.3d 1169, 181 (2000) (en banc.). The court stated that three general approaches have emerged to determine whether a client impliedly waives the attorney-client privilege by placing its counsel's mental impressions or opinions in issue. The first approach provides that a litigant waives the attorney-client privilege if, and only if, it directly puts its attorney's advice at issue in the case. The court cited *Palmer by Diacon v. Farmers Insurance*, 861 P.2d 895 (Mont. 1993), as one of the decisions adopting this approach. *Id.* at 702, n. 6. The second approach provides that a litigant automatically waives the privilege upon assertion

of a claim, counterclaim, or affirmative defense that raises an issue to which privileged material is relevant. Under this approach, the insurer's mere denial of bad faith arguably constitutes a waiver of the attorney-client privilege. Cases applying this approach include *Silva v. Fire Ins. Exch.*, 112 F.R.D. 699 (D.Mont. 1986) and *Boone v. Vanliner Ins. Co.*, 91 Ohio St.3d 209, 744 N.E.2d 154 (2001). The third approach balances the need for discovery with the importance of maintaining the privilege. This approach generally applies the three-part test set forth in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975). *Bertelsen* states that a majority of jurisdictions have adopted this approach. *Id.* at 702.

*Hearn* involved a civil rights lawsuit brought by an inmate against prison officials who asserted qualified immunity as a defense. The qualified immunity defense was, in turn, based on the defendants' alleged good faith. Under the *Hearn* test, "an implied waiver of the attorney-client privilege occurs when (1) the assertion of the privilege was a result of some affirmative act, such as filing suit; (2) through this affirmative act, the asserting party puts the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information vital to its defense. *Id.*, 68 F.R.D. at 581. The court recognized that the defendants had not engaged in the affirmative conduct of instigating the lawsuit. They had, however, asserted the attorney-client privilege "in aid of the affirmative defense that they are protected from liability by qualified immunity. Therefore, all the elements common to a finding of waiver are present in this case[.]" *Id.* In applying this test, the court also stated that "[a] substantial showing of merit to plaintiff's case must be made before a court should apply the exception to the attorney-client privilege defined herein." *Id.* at 582.

In *Home Indemnity Co. v. Lane Powell Moss and Miller*, 43 F.3d 1322 (9th Cir. 1995), the Ninth Circuit applied the *Hearn* test in a case involving a legal malpractice action by an insurer against its former attorneys. The court noted that the *Hearn* test was used by the district court and that neither party objected to its application on appeal. *Id.* at 1326. The court further stated that "[i]n *Hearn*, an overarching consideration is whether allowing the privilege to protect against disclosure of the information would be 'manifestly unfair' to the opposing party."[2]

---

[2] Decisions in this district have followed *Home Indemnity* in applying the *Hearn* test in diversity cases without discussing whether the Nevada Supreme Court will adopt that test. *See Ideal Electric Co. v. Flowserve Corp.*, 230 F.R.D. 603, 610 (D.Nev. 2005) and *Copper Sands Homeowners Ass'n v. Copper Sands Realty, LLC*,

The court in *Bertelsen* stated that "the *Hearn* test alone provides insufficient guidance to be just and workable." 796 N.W.2d at 703. The court stated that the *Hearn* test should be supplemented to emphasize the importance of protecting the attorney-client privilege. The analysis should begin with a presumption in favor of the preserving the privilege. A client only waives the privilege by expressly or impliedly injecting his attorney's advice into the case. A denial of bad faith or an assertion of good faith alone is not an implied waiver of the privilege. Finally, a client only waives the privilege to the extent necessary to reveal the advice he placed at issue. *Id.* By imposing this presumption in favor of the privilege, *Bertelsen* comes close to adopting the first approach that the attorney-client privilege is waived if, and only if, the insurer directly puts its attorney's advice in issue in the case.

In *Cedell v. Farmers Ins. Co. of Washington*, 295 P.3d 239 (Wash. 2013), the Washington Supreme Court adopted a presumption that is essentially the opposite of that adopted in *Bertelsen*. The Washington court held that there should be a rebuttable presumption in first-party insurance bad faith cases that the work product doctrine and attorney-client privilege do not apply. In so holding, the court explained:

> We recognize that two principles we hold dear are in tension in insurance bad faith claims. The purpose of discovery is to allow production of all relevant facts and thereby narrow the issues, and promote efficient and early resolution of claims. The purpose of the attorney-client privilege is to allow clients to fully inform their attorneys of all relevant facts without fear of consequent disclosure. . . . First party bad faith claims by insureds against their own insurer are unique and founded upon two important public policy pillars: that an insurance company has a quasi-fiduciary duty to its insured and that insurance contracts, practices and procedures are highly regulated and of substantial public interest. . . .
>
> To protect these principles, we adopt the same basic approach as the Court of Appeals did in *Barry*. We start from the presumption that there is no attorney-client privilege relevant between insured and insurer in the claims adjusting process, and that the attorney-client and work product privileges are generally not relevant. *Barry*, 98 Wash.App. at 204, 989 P.2d 1172. However, the insurer may overcome the presumption of discoverability by showing its attorney was not engaged in the quasi-fiduciary tasks of investigating and evaluating or processing the claim, but instead in providing the insurer with counsel as to its own potential liability; for

---

2012 WL, at *3 (D.Nev. Dec. 31, 2012). As *Home Indemnity* states, where the state supreme court has not ruled on a question in issue, the federal court looks to other state-court decisions, well-reasoned decisions from other jurisdictions, and any other available authority to determine the applicable state law. 43 F.3d at 1326 (citing *Burns v. International Ins. Co.*, 929 F.2d 1422, 1424 (9th Cir. 1991)).

example, whether or not coverage exists under the law.

295 P.3d at 245-46 (internal citations omitted).

The court exempted uninsured/underinsured motorist coverage bad faith claims from this presumption. The court stated that "[t]he UIM insurer steps into the shoes of the tortfeasor and may defend as the tortfeasor would defend. Thus, in the UIM context, the insurance company is entitled to counsel's advice in strategizing the same defenses that the tortfeasor could have asserted." *Id.* at 245. Even in a UIM bad faith claim, however, there are limits to the insurer's right to assert the attorney-client privilege. The court adopted the following rule for resolving attorney-client privilege claims in UIM bad faith claims:

> First, the court determines whether there is a factual showing adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the fraud exception to the attorney-client privilege has occurred. Second, if so, the court subjects the documents to an in camera inspection to determine whether there is a foundation in fact for the charge of fraud. The in camera inspection is a matter of trial court discretion.

*Id.* at 245.

Although Plaintiff cites the *Cedell* presumption in support of her motion to compel, she fails to discuss the exception to that presumption that the court made for UIM bad faith cases.

Other courts have adopted the crime-fraud exception as the test for determining whether communications between the insurer and its counsel may be discovered in a bad faith action. *Heyden v. Allstate Ins. Co.*, 2013 WL 12171613, at *2 (D. Alaska Dec. 10, 2013) (citing *Central Construction Co. v. Home Indemnity Co.*, 794 P.2d 595 (Alaska 1990)); *State ex rel. Allstate v. Madden*, 601 S.E.2d 25, 26 (W.Va. 2004). The court in *Madden* also adopted the standard set forth in *United States v. Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619, 2631 (1989) for conducting *in camera* review of attorney-client communications— the court has the discretion to conduct *in camera* review where the party seeking disclosure makes a threshold showing adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime-fraud exception to the attorney-client privilege has occurred. The dissent in *Madden* criticized the majority's equation of "fraud" with "bad faith" by the insurer, arguing that the meaning of the terms are not the same and that the decision undermined the narrow scope of the crime-fraud exception. *Id.* at 43-44.

Plaintiff argues that this Court should follow *Silva v. Fire Ins. Exchange*, 112 F.R.D. 699 (D. Mont. 1986) which dismissed the insurer's privilege objections on the grounds that "[t]he time-worn claims of work product and attorney-client privilege cannot be invoked to the insurance company's benefit where the only issue in the case is whether the insurer breached its duty of good faith in processing the insured's claim." *Id.* at 699-700. The *Silva* court cited no authority for this assertion.[3] In *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 156-58 (Ohio 2000), the Ohio Supreme Court more persuasively held that the work product doctrine and attorney-client privileges do not apply in a case involving the alleged bad faith denial of insurance coverage. The insurer in *Boone* initially denied that the insurance policies issued by it provided underinsured motorist coverage for injuries suffered by the plaintiff in an accident. The insurer subsequently reversed its position on coverage. The court held that plaintiff was entitled to obtain attorney-client communications relating to the initial denial of coverage. In *Spiniello v. Hartford Fire Ins. Co.*, 2008 WL 27775643, at *6 (D.N.J. July 14, 2008), the court stated that *Boone* is the minority rule and cited several cases rejecting its approach. The court noted that at least one commentator has criticized *Boone's* "chilling effect" on insurance companies' ability to seek legal advice. *Id.* (citing Steven Plitt, *The Elastic Contours of Attorney-Client Privilege and Waiver in the Context of Insurance Company Bad Faith: There's a Chill in the Air*, 34 Seton Hall L.Rev.513, 572 (2004)).

The Nevada Supreme Court could adopt any one of the three general approaches or some variant thereof. All of these approaches seek to resolve the conflict that exists in upholding an insurer's assertion of the attorney-client privilege in the context of a bad faith claim in which the opinions and recommendations of its coverage counsel are relevant in assessing whether the insurer acted reasonably in light of "the evidence before it at the time it denied the claim." *City of Myrtle Beach v. United National Ins Co.*, 2010 WL 3420044, at *4 (D.S.C. Aug. 27, 2010). The *Hearn* test comes closer than the other approaches in accommodating the public interest in upholding the attorney-client privilege

---

[3]*Silva* was cited in *USF Ins. Co. v. Smith's Food and Drug Center, Inc.*, 921 F.Supp.2d 1082, 1096-97 (D.Nev. 2013), but only for the proposition that a party can request leave to disclose documents under a protective order. The court did not adopt *Silva's* holding that the attorney-client privilege does not apply in insurance bad faith cases.

when it is fair to do so, but in also recognizing that the privilege should not apply when the opinions or advice provided by the insurer's counsel are material to determining whether the insurer acted in bad faith. Application of the *Hearn* approach is probably not significantly different from the crime-fraud analysis proposed by the courts in *Cedell*, *Heyden* and *Madden*. The *Hearn* approach, however, avoids the arguable confusion or weakening of the crime-fraud exception by applying it in the context of an insurance bad faith claim. As the dissent in *Madden* recognized "bad faith" does not necessarily equate to fraud. *See also Potter*, 912 P.2d at 272 (defining "bad faith") and *Lubbe v. Barba*, 91 Nev. 596, 599, 540 P.2d 115, 117 (1975) (setting forth the elements of common law fraud). This Court therefore predicts that Nevada will follow the majority of jurisdictions in adopting the *Hearn* approach.

*Hearn* stated that before holding that the attorney-client privilege does not apply, the plaintiff is required to make "a substantial showing of merit" to his case. *Hearn*, 68 F.R.D. at 582. The court applied that requirement in the context of a lawsuit alleging violations of the plaintiff's civil rights. In *City of Myrtle Beach*, the district court imposed a similar requirement in an insurance bad faith claim which it characterized as making a *prima facie* case of bad faith. 2010 WL 3420044, at *7. *See also Contravest Inc. v. Mt. Hawley Ins. Co.*, 2017 WL 1190880, at *4 (D.S.C. March 31, 2017). This Court believes that such a requirement is necessary. Otherwise, an insurer's mere denial that it acted in bad faith will automatically trigger discovery of confidential attorney-client communications regardless of whether there is any reasonable basis to the claim of bad faith. The plaintiff should be required to show she has a reasonably viable bad faith claim before the the insurer is required to disclose its attorney-client communications.

Plaintiff has not provided much detail for her allegation that State Farm unreasonably undervalued her claim and forced her to engage in prolonged litigation to recover the policy limits. The Court knows that Plaintiff filed her underlying lawsuit in February 2012 and that State Farm paid the $250,000 UIM policy limits over three years later in August 2015. How Plaintiff's injuries or medical condition may have progressed, i.e., deteriorated, remained the same, or improved, during that time period is not described in Plaintiff's complaint or in the briefs on the motion to compel. Likewise, Plaintiff does not explain when State Farm obtained information during the course of handling the claim that should have caused it to pay the $250,000 limits.

Plaintiff bases her claim of bad faith on the alleged statement by State Farm's counsel, Gina Winspear, that she recommended to State Farm that it pay the underinsured motorist coverage limits two years earlier in the litigation. *Amended Complaint* (ECF No. 1), ¶ 19. Mr. Claggett does not state when Ms. Winspear made this statement to him and Mr. Harding. It appears from the context of his declarations that the alleged statement was made shortly before State Farm paid the underinsured motorist coverage limits. Ms. Winspear denies that she made the statement.

If Ms. Winspear did, in fact, recommend that State Farm pay the underinsured motorist coverage limits at a substantially earlier date in the underlying case, it would be relevant in assessing the reasonableness of the insurer's conduct. Because Plaintiff's bad faith claim is predicated on this assertion and State Farm has voluntarily submitted Ms. Winspear's reports for *in camera* inspection, the Court has determined that *in camera* inspection is appropriate. Based on its review of the documents, the Court finds no evidence that Ms. Winspear recommended that State Farm pay the underinsured motorist coverage limits, or some other amount, prior to August, 2015. Nor is there any indication that Ms. Winspear was of the opinion that the Plaintiff's claim had a value at or near the $250,000 underinsured motorist coverage limits at a time significantly before the date those limits were paid. Plaintiff has not made any other showing in support of her claim that State Farm should have paid the $250,000 underinsured motorist coverage limits substantially before August 26, 2015. Therefore, Plaintiff has not met her burden under *Hearn* to support a finding that the attorney-client privilege has been waived or should not be applied in this case.[4]

Defendant's counsel inadvertently produced to Plaintiff in this action a copy of an August 6, 2015 supplemental pretrial report by Ms. Winspear to State Farm. Defendant also inadvertently produced a July 14, 2015 letter from Ms. Winspear's paralegal to State Farm enclosing copies of Plaintiff's supplemental disclosures and providing a calculation of Plaintiff's claimed medical special damages. As stated in Plaintiff's supplement, Ms. Winspear's August 6, 2015 report evaluated the case, including the opinions of State Farm's medical expert, Dr. Maric. *Plaintiff's Supplement* (ECF No. 24), pg. 3. Although Plaintiff may be correct that Ms. Winspear's communications *with* Dr. Maric are not

---

[4] The Court would reach the same conclusion under the crime-fraud exception analysis discussed in *Cedell*, *Heyden* and *Madden*.

privileged,[5] her confidential report to State Farm regarding Dr. Maric's opinions are protected by the attorney-client privilege unless the Court deems the privilege waived.

Plaintiff argues that Ms. Winspear's "communications go to the very heart of Kirsten's claim in the instant bad faith claim. Kirsten claims that State Farm should have paid her insurance policy limits much sooner than it did and, instead, forced her into protracted litigation." *Id.* Dr. Maric's July 24, 2015 report is attached as an exhibit to Plaintiff's supplement. It is dated one month before State Farm paid the policy limits. Dr. Maric stated in his report that he "[did] not find objective evidence that Ms. Spargo sustained any physical injuries as a result of the motor vehicle accident in question. I do not feel that any treatment she received after the motor vehicle accident in question was medically indicated or appropriate for any potential physical injuries which could have occurred as a result of the accident." *Plaintiff's Supplement* (ECF No. 24), *Exhibit 4*, pg. 9. Dr. Maric also noted in his report that Plaintiff was scheduled to undergo surgery by Dr. Cash on August 17, 2015. *Id.* at pg. 2. Dr. Maric stated that he "[did] not find appropriate medical indications for this surgery." *Id.* at pg. 10. A month after Dr. Maric's report, State Farm settled the breach of contract claim by paying the underinsured motorist coverage limits. Plaintiff does not explain how Dr. Maric's July 24, 2015 report and Ms. Winspear's August 6, 2015 report demonstrate that State Farm should have paid her insurance policy limits "much sooner than it did." Plaintiff has therefore also not made a sufficient showing that the attorney-client privilege as to Ms. Winspear's August 6, 2015 report should be deemed waived. The Court will therefore order Plaintiff to immediately return or destroy any copies of the inadvertently produced letters in her possession, custody or control. Plaintiff shall file a verification with the Court that she has done so.

For the reasons set forth above, the Court will also grant Defendant's motion for protective order to preclude Plaintiff from deposing Ms. Winspear about the content of her confidential attorney-client communications with State Farm. The Court will not, however, bar Plaintiff from taking Ms. Winspear's deposition. Ms. Winspear is not counsel for State Farm in this bad faith action. Therefore, case law prohibiting the deposition of the opposing party's attorney does not apply. To the extent that

---

[5] This issue is not before the Court and it takes no position with respect thereto.

13

Ms. Winspear has knowledge of nonprivileged relevant information about the underlying claim, she may be deposed thereon.

## CONCLUSION

Plaintiff has not made a sufficient showing regarding the merits of her bad faith claim to support a finding that Defendant has impliedly waived the attorney-client privilege regarding confidential communications with its counsel in the underlying breach of contract action. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Compel (ECF No. 15) is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Protective Order (ECF No. 28) is **granted**, in part, to the extent that attorney Gina Winspear is not required to testify regarding the contents of any confidential attorney-client communications with State Farm. Plaintiff is not precluded from deposing Ms. Winspear on any nonprivileged relevant matters.

**IT IS FURTHER ORDERED** that Plaintiff shall immediately return or destroy any copies of the July 14, 2015 and August 6, 2015 letters in its possession, custody or control. Plaintiff's counsel shall file a verification with the Court that it has done so.

DATED this 22nd day of June, 2017.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge